UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

BERK-COHEN ASSOCIATES, LLC, &            CIVIL ACTION
MANHATTAN MANAGEMENT COMPANY, LLC

VERSUS                                   NO: 07-9205 c/w
                                         07-9207

LANDMARK AMERICAN INSURANCE CO.          SECTION: R(1)


**ORDER AND REASONS**

Before the Court are several motions for partial summary
judgment and a single motion in limine submitted by defendant,
Landmark American Insurance Co. (Landmark).  For the following
reasons, defendant's motion to limit plaintiffs' business loss is
DENIED; defendant's motion in limine to exclude the expert
testimony of Wade Ragas is DENIED; defendant's motion to preclude
recovery of a ten percent management fee owed for oversight of
construction after Hurricane Katrina is DENIED; defendant's
motion to preclude recovery of a four percent management fee
claimed by Manhattan Management is GRANTED; and defendant's
motion to limit recovery under Louisiana's bad faith statute to
those damages allowed before the August 15, 2006 statutory
amendment is DENIED.

-1-

## I.  BACKGROUND

Plaintiff Berk-Cohen Associates, LLC (Berk-Cohen) owns a sixty-six building apartment complex.  The complex consists of more than 700 apartments and is known as Forest Isle Apartments.  Plaintiff Manhattan Management Co. (Manhattan Management) manages the apartment complex under the terms of a management agreement entered into with plaintiff Berk-Cohen.  As part of its managerial responsibilities, Manhattan Management obtained two policies of insurance from Landmark.  The first, Policy No. LHD340608, covered the Forest Isle Apartments between April 25, 2005 and April 25, 2006.  (R. Doc. 19, Ex. 1-A).  The second, Policy No. LHD346361, covered the Forest Isle Apartments between April 25, 2006 and April 25, 2007.  (R. Doc. 19, Ex. 2-A).  Each policy provided insurance coverage for physical damage to the Forest Isle Apartments as well as lost rental value resulting from such damage.  In addition, each policy provided insurance coverage for other properties Berk-Cohen owned, including apartment complexes in New Jersey and New York.  (R. Doc. 19, Ex. A).  Both plaintiff Berk-Cohen and plaintiff Manhattan Management are named insureds on each policy.

As a result of a series of unfortunate events, the Forest Isle Apartments were severely damaged.  In August 2005, two weeks before Hurricane Katrina, a tornado struck the apartments.

Landmark paid $846,262.00 to cover the physical damage to the buildings. (R. Doc. 19). Before any repairs were made, Hurricane Katrina decimated the greater New Orleans area. Landmark paid $19,349,197.00 for new damages to the buildings. (R. Doc. 19). In May 2006, a fire broke out in ten apartments still under repair from Hurricane Katrina. Landmark paid $609,186.00 for the fire damage. (R. Doc. 19). And lastly, in October 2006, a vehicle struck a transformer causing a temporary power outage. Landmark paid $60,703.00 to fix the transformer. (R. Doc. 19). Repair and rehabilitation of the Forest Isle Apartments began immediately after Hurricane Katrina and, despite the setbacks caused by the fire and transformer incidents, were completed roughly two years later, in September 2007. (R. Doc. 20).

On August 28, 2007, plaintiff Berk-Cohen sued Landmark in state court. On the same day, plaintiff Manhattan Management also sued Landmark in state court. Landmark removed both suits to this Court in accordance with 28 U.S.C. §§ 1332, 1441 and 1446, and the Court consolidated them. The allegations made by Berk-Cohen and Manhattan Management in each of their respective complaints are generally the same. Both plaintiffs allege "losses in business income due to windstorm and other non-flood damages to the Forest Isle Apartment Complex." The derivation of Berk-Cohen's and Manhattan Management's lost business income,

however, is different.  Berk-Cohen claims business income losses relating to rental revenue received from the Forest Isle Apartments.  Manhattan Management claims lost income stemming from a management fee granted under the Management Agreement. (R. Doc. 21).  Berk-Cohen also claims additional losses relating to a ten percent management fee owed to Manhattan Management under the Management Agreement for overseeing "repair, restoration and rehabilitation" of the Forest Isle Apartments. (R. Doc. 20).

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor."  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

-4-

If the dispositive issue is one on which the nonmoving party
will bear the burden of proof at trial, the moving party may
satisfy its burden by merely pointing out that the evidence in
the record contains insufficient proof concerning an essential
element of the nonmoving party's claim. *See Celotex*, 477 U.S. at
325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts
to the nonmoving party, who must, by submitting or referring to
evidence, set out specific facts showing that a genuine issue
exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest
upon the pleadings but must identify specific facts that
establish a genuine issue for trial. *See Celotex*, 477 U.S. at
325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.
1996).

**B.    Insurance Policy Interpretation**

The Court has diversity jurisdiction over this matter under
28 U.S.C. § 1332, and Louisiana state law applies to the
insurance contract at issue.  Under Louisiana law, an insurance
policy is a contract that constitutes the law between the
parties, and it must be interpreted in accordance with the
general rules of contract interpretation set forth in the
Louisiana Civil Code. *See Peterson v. Schimek*, 729 So. 2d 1024,
1028 (La. 1999) (citing La. Civ. Code art. 1983); *Ledbetter v.
Concord Gen. Corp.*, 665 So. 2d 1166, 1169 (La. 1996); *Crabtree v.*

*State Farm Ins. Co.*, 632 So. 2d 736, 741 (La. 1994); *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 420 (La. 1988). The extent of insurance coverage is determined by the parties' intent as reflected by words in the policy. *See* La. Civ. Code art. 2045; *Peterson*, 729 So. 2d at 1028 (citing *Ledbetter*, 665 So. 2d at 1169). If the policy wording is clear, and it expresses the intent of the parties, the agreement must be enforced as written. La. Civ. Code art. 2046; *Pareti*, 536 So. 2d at 420. The policy must be construed as a whole, and one portion should not be construed separately at the expense of disregarding another. *Pareti*, 536 So. 2d at 420. If an ambiguity exists, the ambiguity must be construed in favor of the party seeking coverage. *Id.* The Court may not alter the terms of the policy under the guise of contract interpretation when the language of the policy is unambiguous. *Id.*

## III. ANALYSIS

### A.    Lost Business Income

*1.    Berk-Cohen*

The first of the issues defendant presents arises out of Berk-Cohen's claim for business income lost from its inability to rent apartments in the wake of Hurricane Katrina.  Plaintiff claims that its total business income loss exceeds the policy limits of $4,647,286, and it seeks the maximum recoverable under

the policy. (R. Doc. 20). Defendant, on the other hand,
contends that Berk-Cohen's business income loss is less than the
policy limit. The difference in the two parties' figures stems
from the manner in which each calculates business income loss.
Berk-Cohen's calculations account for a post-Katrina increase in
occupancy rate from 91.4 percent to 100 percent and an additional
up-tick in rental price. (R. Doc. 20). Specifically, Berk-Cohen
claims that the housing shortage after Hurricane Katrina caused
an increase in demand for apartments in the New Orleans area and
consequently, an increase in the rental market value of the
Forest Isle Apartments by more than 40 percent. Defendant's
calculations, on the other hand, rely solely on pre-Katrina
occupancy rates and rental prices.

The purpose of a business income loss provision is to
indemnify insureds for lost income resulting from those events
covered by their insurance policy. *See Ferguson v. State Farm
Ins. Co.,* No. 06-3936, 2007 WL 1378507, at *3 (E.D. La. May 9,
2007)(citing *Berkshire Mut. Ins. Co. v. Moffett*, 378 F.2d 1007,
1011 (5th Cir. 1967)); 15 La. Civ. L. Treatise, Insurance Law &
Practice § 312 (3rd ed.); *Cole v. Celotex Corp.*, 599 So. 2d 1058,
1080 (La. 1992)("As a general rule the claimant may recover under
all available coverages provided that there is no double
recovery."). Whether market changes are appropriate
considerations in calculating lost business income depends upon

-7-

the language of the policy itself. *See* La. Civ. Code art. 2045;

*Peterson,* 729 So. 2d at 1029. When a provision in an insurance

policy is found to be ambiguous, it "is construed against the

insurer in favor of coverage." *Arctic Slope Regional Corp. v.*

*Affiliated FM Ins. Co.,* 564 F.3d 707, 709-10 (5th Cir.

2009)(quoting *Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 193 (La.

2008)); *see also Herbert v. Webre*, 982 So.2d 770, 774 (La. 2008).


The operative language of the Landmark Insurance Policy

defines business income as "a) Net Income (Net Profits or Loss

before income taxes) that would have been earned or incurred; and

b) continuing normal operating expenses incurred, including

payroll." (R. Doc. 19, Ex. A and B). The Landmark Insurance

Policy further states how business income loss will be

determined:

3.    Loss Determination

a.  The amount of Business Income loss will be determined
based on:

(1)  The Net Income of the business before the direct
physical loss or damage occurred;

(2) The likely Net Income of the business if no physical
loss or damage had occurred, but not including any Net
Income that would likely have been earned as a result of
an increase in the volume of business due to favorable
business conditions caused by the impact of the Covered
Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses,
necessary to resume "operations" with the same quality of
service that existed just before the direct physical loss

-8-

or damage; and

(4) Other relevant sources of information, including:
    (a)Your financial records and accounting procedures;
    (b)Bills, invoices and other vouchers; and
    (c)Deeds, liens or contracts.

(R. Doc. 19, Ex. A).

Landmark's policy language has not been construed by the Fifth Circuit or any other appellate court. The Fifth Circuit has analyzed the language of a business income loss provision in *Finger Furniture Co. Inc. v. Commonwealth Ins. Co.,* 404 F.3d 312 (5th Cir. 2005). In that case, the policy provided:

> In determining the amount of gross earnings covered hereunder for the purposes of ascertaining the amount of loss sustained, due consideration shall be given to the experience of the business before the date of the damage or destruction and to the probable experience thereafter had no loss occurred.

*Finger Furniture*, 404 F.3d at 314. The *Finger Furniture* plaintiff conducted an inventory sale at its furniture store one week after Tropical Storm Allison, which had previously closed the store for two days. In its claim for business income loss, the furniture store attempted to use profits from the post-storm sale as documenting actual business lost. The Fifth Circuit construed the policy language to preclude the use of post-damage market data. *Id.* In doing so, the court found that a business's historical sales figures are the best indicator of probable future success. *Id.* The holding set forth by the Fifth Circuit in *Finger Furniture* reflects the Court's understanding of what

contracting parties would likely expect regarding policy coverage, *ex ante*. The insured could not say that a storm did not occur to recover business income loss and simultaneously calculate such loss on the basis that the storm did, in fact, occur and generate greater market demand. *Id.* As the Fourth Circuit stated in a case with a similar factual context, "had the hurricane not occurred, . . . neither would the specifically claimed earnings source have come into being." *Prudential LMI v. Colleton Enterprises, Inc.,* No. 91-1757, 1992 WL 252507, at *4.

Berk-Cohen presents no evidence that the occupancy rate at Forest Isle Apartment Complex would have increased in the absence of the effects Hurricane Katrina had on the area in which it competes for business. Nor does plaintiff present evidence that an increase of rental value would have occurred without the housing shortage resulting from the storm. Instead, Berk-Cohen focuses on the language of paragraph 3(a)(2).

The first clause of Paragraph 3(a)(2) ("[t]he likely Net Income of the business if no physical loss or damage had occurred . . ."), is a familiar one. It roughly mirrors the language of both the *Finger Furniture* and *Prudential LMI* business income loss provisions. If the Landmark policy stopped there, *Finger Furniture* would control. It does not, however. The conjunctive phrase beginning "but not" sheds further light on the scope of the intended coverage. This clause explains what is not covered

by the first clause, *i.e.*, which type of projected income the
insured cannot use to prove his business income loss.  The
insured cannot prove business income using evidence of "likely
Net Income . . . earned as a result of an increase in the *volume*
of business . . . caused by the impact of *the Covered Cause of
Loss*."  (R. Doc. 19, Ex. A)(emphasis added).  Berk-Cohen argues
that the exclusion applies to increases in business due only to
"the Covered Cause of Loss" requires a different result than that
reached in *Finger Furniture*.[1]

Specifically, Berk-Cohen argues that evidence of favorable
business conditions caused by flooding escape the exclusionary
wording in paragraph 3(a)(2) because flooding was not the Covered
Cause of Loss from which the Forest Isle property sustained
covered damage.  (R. Doc. 20).  Landmark's policy language is

---

[1] Berk-Cohen first argues that paragraph 3(a)(2) excludes
only evidence of favorable business conditions resulting in an
increase in "volume," not price.  Business volume, however, is
synonymous with both occupancy rate and price.  *See* Webster's New
World College Dictionary (4th ed. 1999)(defining "volume" as a
"quantity, bulk, mass, or amount").  It is axiomatic that volume
and price are inversely related in the context of market demand.
*See generally*, Richard A. Posner, Economic Analysis of the Law 8
(6th ed. 2003).   An increase in volume decreases price as the
relative value of each marginal unit declines.  *Id.*
Comparatively, a decrease in volume increases price as the
relative value of each marginal unit escalates.  *Id.*  Plaintiff
essentially asks the Court to look at only the numerator or
denominator of a fraction defined by both.  The Court will not
interpret the Landmark Policy to do so, and thus finds that the
word "volume" does not distinguish between number of apartments
and the price charged for each.

different from that of the policies analyzed in *Finger Furniture*
and *Prudential LMI* in both a unique and a significant way.  The
second clause of paragraph 3(a)(2) explicitly refers to "the
Covered Cause of Loss" under the policy.  "Covered Cause of Loss"
is a term defined within the policy itself.  The provision is
instructive, however, because it differentiates between those
favorable business conditions created by the type of loss
triggering coverage by the Landmark Policy and those that are
not.  The policy excludes only favorable business conditions
caused by the same cause of loss for which the insured is
invoking coverage under the policy.  *Finger Furniture* and
*Prudential LMI* contained no such language.  The *expressio unius
est exclusion alterius* principle of construction–"the expression
of one thing implies the exclusion of the other"–instructs that
the explicit removal of favorable market conditions resulting
from "the Covered Cause of Loss" from the business income
calculation implies that those market conditions resulting from
non-covered causes of losses are permissible.

Landmark argues that flood is covered under the policy, so
that favorable business conditions due to flooding are foreclosed
as a source of lost business income.  Landmark makes this
argument because the policy covers multiple properties and the
policy contains flood coverage endorsements covering flood damage
to properties in certain flood zones.  Landmark's argument is

rejected because the policy excludes changed business conditions caused by *the* Covered Cause of Loss, not *a* Covered Cause of Loss. The use of the definite article "the" restricts the covered loss to the one that triggered the coverage at the insured property at issue.

Landmark ultimately concedes that flood is not a Covered Cause of Loss at Forest Isle Apartments. (R. Doc. 60). But, defendant argues that allowing recovery for favorable business conditions resulting from flood when the policy precludes recovery for actual flood damage is "an absurd conclusion." *Id.* The flood exclusion is property-specific, relieving Landmark of obligation to cover property for flood damage because of its particular location and presumably the risk it poses of being flooded. Berk-Cohen did not seek to recover for flood damage at the Forest Isle location. Landmark got the benefit of its flood exclusion. Landmark's policy illustrates an intent to prevent the insured from benefitting from the same cause of loss for which it invoked coverage. Further, Landmark's interpretation would render the second clause in paragraph 3(a)(2) superfluous. It would make no sense for the drafters of the Landmark Policy to include language in paragraph 3(a)(2) that explicitly excludes favorable business conditions resulting from the Covered Cause of Loss, if the drafters intended to also exclude favorable business conditions resulting from losses not covered under the policy,

such as those resulting from flood.  The Court must interpret the Landmark Policy as to give meaning to all of its various provisions.  *See* La. Civ. Code art. 2049 ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.").

Lastly, Landmark argues that the policy covers physical loss resulting from the hurricane as a unitary storm resulting in both wind and flood damage, and therefore the distinction between wind and flood is of no import.  (R. Doc. 30).  Though distilling the cause of damage may be difficult at times, the Landmark Policy wording specifically references "the Covered Cause of Loss" and subsequently differentiates between wind and flood damage.  (R. Doc. 19, Ex. A).  The Court will not treat wind and flood damage as the same when the policy itself does not do so.  *See, e.g., Deslonde v. Allstate Ins. Co.,* No. 07-4314, 2008 WL 440417, at *3 (E.D. La. Feb. 13, 2008); *Wellmeyer v. Allstate Ins. Co.,* No. 06-1585, 2007 WL 1235042, at *2 (E.D. La. Apr. 26, 2007).

The Court finds the Landmark Policy allows Berk-Cohen to recover for favorable market conditions resulting from flooding. It should come as no surprise that seemingly disparate coverages would result when a single policy attempts to account for the range of risks attributable to properties in diverse geographic locations.  The parties appear to have contemplated different

-14-

business income coverages for each property covered under policy when they incorporated both clauses of paragraph 3(a)(2) into the policy, and referred to "the Covered Cause of Loss" in the second clause. For the foregoing reasons, the Court DENIES defendant's motion for partial summary judgment precluding Berk-Cohen's use of changed market conditions as evidence of future business income.

*2. Manhattan Management*

Plaintiff Manhattan Management also makes a claim for lost business income under the terms of its Management Agreement with plaintiff Berk-Cohen. The Management Agreement grants Manhattan Management four percent of the gross rents earned at Forest Isle Apartments for its various management services. Manhattan Management acknowledges that Berk-Cohen has not deducted from its own claim this four percent fee and that an award to both plaintiffs separately for that which each prays, would result in double recovery. To simplify matters, Manhattan Management does not oppose Landmark's motion for partial summary judgment in regards to its claimed business loss. (R. Doc. 21). The Court accordingly GRANTS defendant's motion.


**B. Motion in Limine**

Berk-Cohen puts forward the expert testimony of Wade Ragas in support of its claim for recovery of lost business income.

Dr. Ragas is an expert in the New Orleans rental housing market and possesses a doctorate in business administration. Dr. Ragas's testimony and expert report seek to differentiate the rental income Berk-Cohen could have achieved had the Forest Isle Apartments and surrounding New Orleans area sustained only flood, and not wind damage. Defendant moves the Court to exclude Dr. Ragas's testimony on the basis that it is not relevant. Given the Court's holding above, however, Dr. Ragas's testimony is relevant to Berk-Cohen's lost business income claim. Defendant also questions the validity of Dr. Ragas's methodology and statistical analysis under *Daubert*. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Dr. Ragas's projections utilize actual market data originating after Hurricane Katrina. Defendant can explore this issue with Dr. Ragas on cross-examination. His testimony is not subject to exclusion on this ground. The Court therefore DENIES defendant's motion in limine.

**C.   Ten Percent Management Fee**

Defendant next moves for partial summary judgment on Berk-Cohen's claim for recovery of a ten percent management fee owed Manhattan Management for its supervision of the restoration efforts after the tornado, hurricane, fire, and transformer

incidents at the Forest Isle Apartments.[2]  Specifically, Berk-

Cohen seeks $1,677,500 for Manhattan Management's supervision

relating to losses incurred from Hurricane Katrina, $76,570.10

for supervision relating to losses incurred from the August 2005

tornado, $51,531.06 for oversight of restoration after the May

2006 fire, and $6,891.27 for supervision relating to losses

incurred from the transformer incident in October 2006.  (R. Doc.

20).  Berk-Cohen seeks to recover these amounts as a "necessary

expense incurred" under the business income loss provision of the

Landmark Policy.  (R. Doc. 1).  The Landmark Policy provides

coverage for business income and, as previously stated, defines

such income to include "[c]ontinuing normal operating expenses

incurred, including payroll."  (R. Doc. 19, Ex. A and Ex. B).

Paragraph 3(a)(3) of the Loss Determination section of the policy

further elaborates that such expenses include those "necessary to

resume 'operations' with the same quality of service that existed

just before the direct physical loss or damage."  (R. Doc. 19).

Landmark disputes whether the management fee is due under the

terms of the Management Agreement itself.[3]  (R. Doc. 19).

The Management Agreement provides for a four percent fee for

---

[2] Manhattan Management does not pray for recovery of any
fees related to the Management Agreement.

[3] Landmark reserves arguments relating to the validity of
the management agreement as an illusory contract between
identical parties.

general "management services." (R. Doc. 19, Ex. 1-C).
Presumably, this covers the day-to-day operations at Forest Isle,
including the routine maintenance and repairs of apartments. The
Management Agreement also contemplates coverage for more
extensive management oversight, such as for construction relating
to modernization, rehabilitation, and fire damage restoration.
(R. Doc. 19, Ex. 1-C, Section 17.4-5). The Management Agreement
compensates Manhattan Management for this additional oversight in
the form of a payment equating to ten percent of the aggregate
costs of the supervised project. *Id.*

The scope of the management services compensated for under
plaintiffs' Management Agreement and the scope of the recoverable
"normal operating expenses incurred" under the Landmark Policy
are not necessarily commensurate, however. The Landmark Policy
covers those "normal operating expenses incurred . . . necessary
to resume operations with the same *quality of service* that
existed just before the direct physical loss or damage." (R.
Doc. 19, Ex. 1)(emphasis added). Efforts to modernize by
constructing new facilities, for example, may lead to higher
quality apartments, amenities, and other services for Forest Isle
tenants. In this case, a management fee might be owed under the
Management Agreement but not recoverable under the Landmark
Policy. By comparison, rebuilding subsequent to a physical loss
may include efforts to modernize without simultaneous enhancement

in the quality of apartment, or service, provided.  The Court
therefore finds that issues of fact remain: first, as to whether
the restorative efforts at the Forest Isle apartments increased
the "quality of service" provided; and second, if the restoration
did increase the quality of service, to what extent the
management fees owed are for oversight of expenses incurred "to
resume 'operations' with the same quality of service."


**D.    Statutory Bad Faith Claim**

Lastly, Landmark moves the court to hold that any award of
bad faith penalties under the Louisiana Bad Faith Statute, if
found, be entered under the pre-August 15, 2006 version of the
statute.  The earlier version of the Louisiana Bad Faith Statute
denied recovery of attorney's fees and limited statutory damages
to twenty-five percent of the amount found due to the insured.
*See* LSA-R.S. 22:658(B)(1)(2004).  Plaintiff Berk-Cohen seeks
damages under the Louisiana Bad Faith Statute in relation to both
their claimed business income losses addressed in Section III.A.
and the ten percent management fee addressed in Section III.B.

The parties dispute when plaintiff Berk-Cohen first filed a
proof of loss on their business income claim.  Defendant argues
that Berk-Cohen first submitted a claim of loss four months
before the amendment of the Louisiana Bad Faith Statute.  In
support, defendant submits a proof of loss form submitted on

April 27, 2006.  (R. Doc. 64, Ex. 1).  Item 10 of the form

includes a $12,673,237 "[p]artial Claim for ACV and BI (Business

Income)."  Berk-Cohen, however, alleges that it first submitted a

business income claim on June 8, 2007, and that any amounts paid

towards business income losses beforehand were premised on

Landmark's own preliminary calculations.  In support, Berk-Cohen

submits the affidavit of Stephen Enslow, Landmark's adjuster, in

which he states that Berk-Cohen had not filed a business income

claim as of May 2007.  (R. Doc. 40, Ex. A).  In addition, Berk-

Cohen alleges that new business income losses occurred every

month until the conclusion of the restoration period in September

2007.

The Louisiana Supreme Court held in *Sher v. Lafayette Ins.*

*Co.* that the amendment to the Louisiana Bad Faith Statute could

not be applied retroactively.  988 So. 2d 186, 201 (La. 2008).

*Sher* also held that the triggering event for the Louisiana Bad

Faith Statute is submission of a satisfactory proof of loss, not

the occurrence of an event upon which an insurance claim may

arise.  *Id.* at 199.

A genuine issue of fact remains as to when plaintiff Berk-

Cohen first filed a proof of loss on its business income claim.

The April 2006 proof of loss form appears intended as only a

partial claim for business income.  The form states as much in a

type-written insert and does not further itemize the losses

claimed.  Moreover, the nature of a business income claim is unlike that for physical damage to property caused by a catastrophe, in which a one-time event gives rise to a continuing duty to adjust a single claim in good faith.  *See id*.  A business income claim continues to accrue each month throughout the respective period of restoration.  In the present case, the period of restoration did not conclude until September 2007.  As such, even if Berk-Cohen first filed a proof of loss in April 2006, a portion of the business income claim could still arise after the August 15, 2006 statutory amendment.  *See Sher,* 988 So.2d at 199 (discussing proof of loss for new damage arising after the satisfiaction of an initial proof of loss).  Defendant's motion for partial summary judgment is therefore, DENIED.


**IV.  CONCLUSION**

For the foregoing reasons, the Court DENIES defendant's motion for partial summary judgment prohibiting plaintiffs' use of actual market data after Hurricane Katrina to demonstrate business income loss.  The Court GRANTS defendant's motion for partial summary judgment of Manhattan Management's claim for a four percent management fee under the Management Agreement.  The Court DENIES defendant's motion in limine to exclude the expert testimony of Wade Ragas.  The Court also DENIES defendant's

motion for partial summary judgment regarding the ten percent management fee owed Manhattan Management for oversight of restoration efforts at Forest Isle apartments.  Lastly, the Court DENIES defendant's motion for partial summary judgment to limit any award of statutory penalties and attorney's fees under the Louisiana Bad Faith Statute to those allowed under the version of the statute enacted before the August 15, 2006 amendment.


New Orleans, Louisiana, this <u>27th</u> day of August, 2009.


*Sarah Vance*
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE